UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EDITH ANNE ANGELI,

        Plaintiff,

v.                                Case No. 14-cv-1452-pp

NANCY A. BERRYHILL[1],
Acting Commissioner, Social Security Administration,

        Defendant.

## ORDER AFFIRMING THE FINAL ADMINISTRATIVE DECISION OF THE COMMISSIONER

## I.    INTRODUCTION

Plaintiff Edith Angeli seeks judicial review of a final decision of defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, who found that the plaintiff was not "disabled" within the meaning of the Social Security Act. The Social Security Administration's Appeals Council denied review, making the Administrative Law Judge's (ALJ's) decision the final decision of the Commissioner.

The plaintiff contends the ALJ erred in evaluating the plaintiff's credibility, gave insufficient weight to the opinion of one of the plaintiff's treating providers, and improperly disregarded the vocational expert's

---

[1] At the time the plaintiff filed her complaint, Carolyn Colvin was the acting commissioner of the Social Security Administration. On January 23, 2017, Nancy A. Berryhill became acting commissioner; the court has made that change in the caption of the case.

1

testimony in determining that the plaintiff is not disabled. The plaintiff argues that this court should reverse the Commissioner's decision and award her benefits, or remand the case to the ALJ for further proceedings. For the reasons stated below, the court will affirm the Commissioner's decision.

## II.    STANDARD OF REVIEW

### A.    Judicial Review

When the Appeals Council denies a claimant's request review, the ALJ's decision constitutes the final decision of the Commissioner. Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). Judicial review under §405(g) is limited; the court will reverse only if the ALJ's decision is not supported by substantial evidence, is based on legal error, or is so poorly articulated as to prevent meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Id. (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). If conflicting evidence in the record would allow reasonable minds to disagree about whether the claimant is disabled, the ALJ's decision to deny the application for benefits must be affirmed. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The district court must review the entire record, including both the evidence that supports the ALJ's conclusions as well as evidence that detracts

2

from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Id.

In sum, the district court will uphold a decision so long as the record reasonably supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008).

B.    Disability Determination

The Social Security Administration provides "disability insurance benefits and supplemental security income to persons who have a 'disability.'" Barnhart v. Thomas, 540 U.S. 20, 22 (2003) (citing 42 U.S.C. §§423(d)(2)(A), 1382c(a)(3)(B)). To qualify as "disabled," the claimant must demonstrate a "physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. at 21-22. The Social Security Act further "defines 'disability' as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. at 23.

In evaluating a claim for disability benefits, the ALJ follows a five-step, sequential process, asking:

> (1)    Has the claimant engaged in substantial gainful activity since her alleged onset of disability?
>
> (2)    If not, does she suffer from a severe, medically determinable impairment?
>
> (3)    If so, does that impairment meet or equal any impairment listed in SSA regulations as presumptively disabling?
>
> (4)    If not, does she retain the residual functional capacity ("RFC") to perform her past work?
>
> (5)    If not, can she perform other jobs existing in significant numbers?

E.g., <u>Villano v. Astrue</u>, 556 F.3d 558, 561 (7th Cir. 2009).

If it appears at any step that the claimant is not disabled, the analysis ends. 20 C.F.R. §404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

## III.    DISCUSSION

### A.    <u>Factual Background and Procedural History</u>

This case involves the plaintiff's second application for disability benefits. According to the ALJ's decision in the current case (issued August 9, 2013, Dkt. No. 10-3), the plaintiff had applied for disability benefits in October 2006, based on her diagnosis of multiple sclerosis. Dkt. No. 10-3 at 20. "That application was denied in December 2006," and the plaintiff does not appear to have appealed. <u>Id.</u> The plaintiff regained eligibility to apply for disability insurance benefits on October 1, 2010. <u>Id.</u> On September 7, 2011, she applied

4

for disability benefits for a second time, alleging she had been disabled since November 1, 2010 because of multiple sclerosis. Id. After the plaintiff filed her application, the Social Security Administration credited two additional quarters of coverage to her earnings record (based on work performed in 2011), and her "date last insured was extended" from December 31, 2010, to June 30, 2011. Id.

The Social Security Administration initially denied the plaintiff's application on November 30, 2011, and denied it again on May 11, 2012 on reconsideration. Id. Before the Administration forwarded the case to the ALJ for a hearing and decision, the Administration informally remanded the case for further review to medical consultants for the California Disability Determination Services, who concluded that the plaintiff was not disabled. Id. The ALJ then held a hearing on May 31, 2013. Both the plaintiff and her husband testified at the hearing, along with a vocational expert. Id.

The plaintiff's disability application indicated that between September 2009 and October 2010, she had worked at "Entertainment Concept Services," a company that she and her husband owned, which sold and installed custom audiovisual equipment. Id. at 23. The plaintiff testified at the administrative hearing that she stopped working for the company on October 31, 2010. Id. at 24. Despite the fact that the disability application indicated that the plaintiff was employed only in 2009 and 2010, "some earnings were also reported for 2011." Id. at 23. The plaintiff also indicated at the hearing that she'd started working for the company in 2000, nine years before the dates the application

indicated that she'd been employed. Id. The fact that the wages earned in the years the plaintiff had chosen to report on her application—2009 through 2011—"served to give [the plaintiff] just enough quarters of coverage to once again meet the insurability requirements for Title II and allow her to reapply for Disability Insurance Benefits after her insured status had previously ended four years earlier . . . ." Id. This fact piqued the ALJ's interest.

The plaintiff claimed at the hearing, however, that she did not work in 2011. Id. Rather, she claimed that she stopped working on October 31, 2010, a date that the ALJ noted in his decision was "a date not coincidentally that came right after [the plaintiff] had regained her eligibility" to claim disability insurance benefits. Id. at 25. While both the plaintiff and her husband testified at the hearing that the plaintiff no longer owned any interest in the business, the plaintiff had claimed on her 2011 disability application "that she still had authority to sign for the business and that in conjunction with [the plaintiff's] involvement in the operation, [the couple] presented it as a minority owned business in 2011 while bidding on a contract." Id. at 24.

As a result of these inconsistencies, the ALJ found the testimony of the plaintiff and her husband "less than completely clear" "as to the business operations, the [plaintiff's] interest and participation in those operations, and the specific dates of her involvement in that business . . . ." Id. at 25. So the ALJ requested the couple's individual and business tax returns, "to better judge how [the plaintiff] was being treated [by the taxing authorities] from a business perspective." Id. Those returns showed that the state and federal

6

taxing authorities "continued to treat [the plaintiff] as a wage earner in 2011 . .

. ." Id. Based on "indirect references in the medical records suggesting work

activity" after October of 2010, id. at 24, the plaintiff's business records, and

her individual and business tax returns, the ALJ found "some suggestions that

she may still have had earnings through the first quarter of 2011," id. 35.

Given that, the ALJ included in his consideration the plaintiff's earnings in the

first two quarters of 2011, and thus concluded that the plaintiff's date of last

insured was June 30, 2011 (not December 31, 2010, as it would have been had

he not considered the wages from the first two quarters of 2011). Id. at 24.

His review of all of this information caused the ALJ to express skepticism

that the plaintiff and her husband had accurately represented the plaintiff's

work history and disability onset date (which the plaintiff alleged was

November 1, 2010). Id. at 25-26. He engaged in a bit of speculation as to why

the plaintiff and her husband might not have been candid, hazarding that the

plaintiff's minimal reported earnings between 2002 and 2006, her unsuccessful

2006 disability application, and her reported earnings and work activity

between 2009 and 2011 "may well have had something to do with the

[plaintiff's] decision to suddenly give her reported earnings for 2009, 2010 and

2011." Id. at 26. In noting this possibility, it was "not lost on" the ALJ that the

plaintiff's husband (and owner of the business that had employed her) might

have been "displeased with the 2006 unfavorable determination and the

continued cost of high risk health insurance for the [plaintiff] . . . ." Id. at 26.

The ALJ cautioned, however, that if the plaintiff and her husband had

7

manipulated income and date information to obtain eligibility, that manipulation might come back to haunt them. He noted that once the plaintiff's insurance eligibility had been restored and she made a new application for benefits, she would have to minimize the very work that gave rise to the earnings that restored her eligibility, in order to demonstrate that she couldn't engage in substantially gainful activity, or didn't have the ability to perform "past relevant work." Id.

Despite the ALJ's doubts about the credibility of the plaintiff and her husband with regard to the plaintiff's work history, the ALJ decided to "proceed with the sequential evaluation." Id. at 26. He noted that his conclusion as to the plaintiff's earnings in 2011 required him to consider both her late 2010 and early 2011 medical records Id. The plaintiff's medical records reflected that she had a diagnosis of multiple sclerosis dating back at least to 2006. Id. At that time, the Social Security Administration had found that the plaintiff's condition "did not meet or equal Listing 11.09 [MS]" or any other listing, and was not "sufficiently severe as to preclude her from all work activity." Id. The ALJ focused primarily on the plaintiff's treatment records since October 2010, because the plaintiff had not alleged in the instant application any disability prior to 2010. Id. at 27.

The ALJ acknowledged that "any case involving multiple sclerosis can be difficult to [analyze]," because MS was "a condition that can be considered severe and one likely to progress over time even with optimum treatment." Id.

at 31. The ALJ also stated that, because the plaintiff was "relatively young,"[2] "in order for her to be found disabled she would need to establish either that her condition met or equaled one of the listed impairments or was sufficiently severe to preclude her from even sedentary work . . . ." Id. at 27.

In view of the plaintiff's age and the difficulties in analyzing an MS sufferer's ability to work, the ALJ stated that "the ultimate question [was] whether [the plaintiff's] condition was sufficiently severe for a very brief period between October 2010 and June 2011 in which she was insured to warrant a finding of disability." Id. at 32. Then, stepping back, the ALJ explained that "[t]he penultimate question [was] two-fold 1) whether her condition either met or equaled section 11.09 (or any other section) in Appendix I, Subpart P of Regulations No. 4 and if not, 2) whether it would preclude her from performing her past relevant work or any other work . . . ." Id.

The inconsistencies in the description of the plaintiff's work history and activities in the relevant time period compounded the ALJ's difficulty in answering these questions. Id. The ALJ had "serious questions" about the credibility of the implication raised in the couple's testimony that the plaintiff "was completely out of the picture after October 31, 2010," because the plaintiff's treatment records before and after the alleged onset date of November 1, 2010 did not reflect much of a difference in her condition. Id. The ALJ gave "little weight" to the "fill in the blank form" that the plaintiff's primary treatment provider, Dr. Douglas Woo, had completed in June 2012, id., in

---

[2] At the time of the ALJ's decision, the plaintiff was forty-two years old. Dkt. No. 10-3 at 22.

which Woo found the plaintiff was incapable of even low stress work, id. at 30. The ALJ gave "greater weight" to Dr. Woo's contemporaneous progress records, which the ALJ opined were likely to be more accurate descriptions of the plaintiff's condition at particular points in time, and were less susceptible to being "influenced by outside variables, such as the desire to help a patient get disability benefits." Id. Even giving more weight to those progress reports, however, the ALJ found, after "having reviewed all of the medical records leading up to June 30, 2011, that they were "not all that impressive in terms of significant medical findings which one would view as being so severe as to prevent [the plaintiff] from all work activity." Id.

The ALJ indicated that he did not intend to "minimize the significance of [the plaintiff's] condition or the serious implications it poses to her at present and in the future," but stated that he "believe[d] that the degree of present limitation both physically and cognitively may be overstated, particularly for the nine month period in question (i.e. October, 2010-June 2011)." Id. at 33. He further found that the plaintiff's condition did not meet or equal the impairments in listing 11.09 or 12.02. Id. at 32-33.

After reviewing the record, the ALJ concluded that, while the plaintiff alleged that she'd not engaged in substantial gainful activity from the onset date of November 1, 2010 through the June 30, 2011 date last insured, the record suggested otherwise. Id. at 35. He concluded that she did have, through the date last insured, a severe impairment (MS). Id. He concluded that that impairment did not meet or equal the severity of the listed impairments in the

SSA regulations. Id. He concluded that she was unable to perform any past work, "some of which was of a more exertionally demanding nature than sedentary and others of a particularly skilled nature." Id. Finally, the ALJ concluded that given the plaintiff's age, education, work experience and residual functional capacity, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." Id. at 36.

After summarizing the plaintiff's physical and mental abilities, the ALJ found that the plaintiff lacked the residual functional capacity to perform her past relevant work, but had the residual functional capacity to perform an essentially full range of unskilled sedentary work. Id. at 35. Because the ALJ found that the plaintiff was "capable of a full range of unskilled sedentary work," he concluded that "the vocational expert's testimony is not necessary in this particular instance." Id. at 34-35.

    B.    <u>The Court Will Affirm the Commissioner's Decision, Because the Court Finds No Error in the ALJ's Credibility Determination, the Weight Given to the Plaintiff's Treating Physician's Opinion, or the ALJ's Residual Functional Capacity Determination.</u>

        1.    *The ALJ's credibility determination was not patently wrong.*

The court deferentially reviews an ALJ's credibility determination because the ALJ, not the reviewing court, is in the best position to evaluate the plaintiff's and other witnesses' credibility. <u>Simila v. Astrue</u>, 573 F. 3d 503, 517 (7th Cir. 2009). The ALJ is "in a special position to hear, see, and assess witnesses." <u>Murphy v. Colvin</u>, 759 F.3d 811, 815 (7th Cir. 2014). The court will not overturn the ALJ's credibility determination unless it lacks any explanation

Case 2:14-cv-01452-PP   Filed 03/06/17   Page 11 of 22   Document 16

or support, and a credibility determination will be upheld as long as it is explained in a way that allows the court to determine that the ALJ logically based the determination on specific findings and record evidence. Id. at 816.

The ALJ's credibility determination does not have to be error free, as long as it is not "patently wrong." Id. The ALJ's determination is only patently wrong when it "lacks any explanation or support." Id. (citing Elder v. Astrue, 529 F. 3d 408, 413-14 (7th Cir. 2008)). At a minimum, the ALJ must explain his justification for rejecting or accepting specific evidence of disability. Rice v. Barnhart, 384 F. 3d 363, 371 (7th Cir. 2004). A claimant for Social Security disability benefits can establish the severity of her symptoms through her own testimony, but a claimant's subjective complaints need not be accepted if they conflict with the claimant's testimony or other objective medical evidence in the record. Arnold v. Barnhart, 473 F. 3d 816, 823 (7th Cir. 2007). An ALJ may discount a claimant's testimony based on other evidence in the record. Johnson v. Barnhart, 449 F. 3d 804, 804 (7th Cir. 2006).

In this case, the ALJ had "serious questions" about the credibility of the plaintiff and her husband. Dkt. No. 10-3 at 32. The doubts stemmed from the timing of the plaintiff's prior application for disability benefits, her subsequent work history, her second application for disability benefits, evidence that the plaintiff had engaged in substantial gainful activity after she filed her second application, her reported earnings for the years 2009 through 2011, and inconsistencies in regarding the plaintiff's ownership and financial interests in her husband's audiovisual business. The plaintiff's 2006 application for

12

disability benefits had been denied, she did not manage to accrue enough earnings to become eligible for insurance again until October 2010, she claimed onset of her disability one month later, and then she provided inconsistent information (through the application and her testimony) about when she stopped working. When the ALJ could not resolve the inconsistencies in the information he'd been provided, he reasonably concluded that the couple's statements about the plaintiff's condition and her work capacity could have been influenced by self-interest (the length of time that the plaintiff had gone since her denial of benefits and the cost to the business of insuring the plaintiff).

The plaintiff argues that there was evidence in the record before the ALJ to support the assertion that she stopped working in 2010, and that she suffered disability onset in 2010—2010 treatment notes listed her profession as a homemaker, and her husband testified that 2010 was a very good year for the company. Dkt. No. 13 at 9. But the fact that there is some evidence in the record supporting the plaintiff's credibility does not render the ALJ's conclusion to the contrary faulty; an ALJ can consider the totality of the evidence in determining whether a claimant's disability claim is credible. E.g., Berger v. Astrue, 516 F.3d 539, 545-46 (7th Cir. 2008) (the failure to report earnings on income tax returns can justify skepticism when evaluating a claim for disability benefits).

The ALJ's conclusion was logically based on evidence in the record. It shows that he reviewed the information in the plaintiff's disability application,

Case 2:14-cv-01452-PP   Filed 03/06/17   Page 13 of 22   Document 16

her testimony at the administrative hearing, her husband's testimony at the hearing, the couple's tax returns, and the plaintiff's medical records in reaching his conclusion that the plaintiff's credibility was questionable. The medical evidence suggests that the plaintiff might have exaggerated the intensity, persistence, and limiting effects of her symptoms in order to qualify for disability benefits. For example, despite her waxing and waning symptoms (which is consistent with the progression of relapsing-remitting multiple sclerosis), the medical evidence supports the conclusion that the plaintiff's condition remained relatively stable during 2010 through 2011. Her activities of daily living likewise remained consistent, although she was limited at times by fatigue. The chronology of the plaintiff's past application for benefits, her subsequent work, and the inconsistent evidence about how the plaintiff and her husband reported her earnings casts doubt on the plaintiff's credibility. The court finds that there is evidentiary support for the ALJ's conclusion that the plaintiff's statements about her condition and work capacity were not entirely credible and might have been influenced to some extent by self-interest to obtain benefits. The court finds that the ALJ's credibility determination is not patently wrong.

2. *The ALJ Did Not Err in Determining that the Plaintiff Engaged in Substantial Gainful Employment after her Alleged Disability Onset Date.*

The plaintiff argues that the ALJ erred in his step-one analysis of whether the plaintiff engaged in substantially gainful employment after disability onset date. The plaintiff claims that the ALJ "seem[ed] fixated on the

14

amount of gainful activities and impli[ed] that Plaintiff went back to work/had earnings simply to elongate her [date last insured]." Dkt. No. 13 at 10. She argues that the ALJ "failed to properly employ the regulations to consider *how* Plaintiff previously engaged in self-employment and whether it truly was gainful activity." Id. at 11. Finally, she contends that the ALJ should not have focused solely on whether the plaintiff had any earnings after the November 10, 2010 onset date. Id.

The ALJ's decision does not support the plaintiff's argument. The ALJ had doubts about the plaintiff's credibility because (1) the plaintiff reported 2011 earnings on her disability application, (2) her disability application indicated that the plaintiff had the authority to sign for the business as of 2011, and (3) the plaintiff engaged in contract bidding as a minority-owned business in 2011. These facts, combined with the fact that the plaintiff earned wages in 2011, would have been sufficient to warrant the ALJ concluding that the plaintiff had engaged in substantially gainful activity after her November 1, 2010 onset date. Nonetheless, the ALJ decided to "defer any specific finding here and proceed with the sequential evaluation."

The ALJ did not conclusively resolve this issue in his decision, however. His findings of fact state that the plaintiff "alleges that she did not engage in substantial gainful activity during the period from her alleged onset date of November 1, 2010 through her date last insured of June 30, 2011, although [the ALJ] does note some suggestions that she may still have had earnings" in 2011. Dkt. No. 10-3 at 35.

The ALJ did not expressly find that the plaintiff had engaged in substantial gainful employment after her alleged disability onset date. Instead, he implicitly accepted the plaintiff's allegation that she had no such earnings and proceeded to consider the severity of her impairments and her residual functional capacity. The court finds no error in the ALJ's consideration of the plaintiff's earnings between the date of her disability onset and the date she was last insured.

3. *The ALJ Did Not Err in Declining to Give Dr. Woo's Opinion Controlling Weight.*

The plaintiff argues that the ALJ erred by declining to give controlling weight to Dr. Woo's opinion that the plaintiff was totally disabled. If a treating physician's opinion is internally inconsistent, or inconsistent with other evidence in the record, the ALJ is not required to give the opinion controlling weight. Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. §404.1527(c)(2)); see also Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) ("A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."). Instead, the ALJ can assign lesser weight to the opinion. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. Moss v. Astrue,

16

555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ must give "good reasons" for his determination as to the amount of weight to give a treating physician's opinion, 20 C.F.R. § 404.1527(c)(2), but "an ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." Pepper v. Colvin, 712 F.3d 351, 363 (7th Cir. 2013). This court is not to reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. Boiles v. Barnhart, 395 F.3d 421, 425 (7th Cir. 2005).

Dr. Woo completed a Multiple Sclerosis Medical Source Statement (described by the ALJ as a "fill in the blank form") in June 2012—after the plaintiff had submitted her disability application. In that document, Dr. Woo stated his opinion that the plaintiff was "incapable of even 'low stress' work' due to her "significant fatigue and cognitive dysfunction." Dkt. No. 10-21 at 59. The ALJ gave "greater weight to [Dr. Woo's] contemporaneous progress notes, which not only are likely to be a more accurate description of [the plaintiff's] status at that specific point in time that he was examining [the plaintiff], but also are less likely to be influenced by . . . the desire to help a patient get disability benefits." Dkt. No. 10-3 at 32. The ALJ found that those contemporaneous progress notes, and the plaintiff's medical records, did not support the severity of the limitations Dr. Woo ascribed to the plaintiff in his form, some of which "[were] even greater than those that [the plaintiff] herself had previously acknowledged, while others touch[ed] on subjects that would

17

seem to be out of his area of expertise, such as [the plaintiff's] mental status."
Id.

The plaintiff's contemporaneous progress notes showed that the plaintiff's multiple sclerosis had remained stable throughout 2010 and through the June 2011 time period, with the exceptions of (1) an episode in July 2010 when she suffered an onset of pain over her scalp that resolved with high-dose steroids, and (2) an episode in November 2010 in which she reported changes in her taste and ringing in her ears. Dkt. No. 10-17 at 9; Dkt. No. 10-18 at 11. Aside from those two incidents, Dr. Woo's treatment records contain no suggestion that the plaintiff had other relapses or significant progressive neurologic decline. Id. at 29; see generally, Dkt. Nos. 10-17 and 10-18. A visit note dated January 11, 2011 stated that "[h]er MS has been doing fairly well." Dkt. No. 10-17 at 39. Her daily living activities had been stable. Id. at 9, Dkt. No. 10-18 at 11. While it is clear from Dr. Woo's progress notes that the plaintiff had some limitations due to multiple sclerosis, his notes do not support the conclusion that she could not perform even low stress work.

The court finds that the ALJ's fulsome discussion of his review and analysis of the plaintiff's medical records and the hearing testimony allows the court to trace his path of reasoning and to conclude that his decision not to give Dr. Woo's opinion controlling weight rests on substantial evidence. The court will not second-guess the ALJ's decision or re-weigh the evidence.

18

4. *The ALJ Did Not Err in Using the Medical Vocational Guidelines to Determine that the Plaintiff Was Not Disabled.*

Finally, the plaintiff argues that the ALJ erred at step five in determining that there were jobs the plaintiff could perform in the national economy, so the plaintiff was not disabled. Specifically, the plaintiff argues that the ALJ (1) erroneously relied only on Rule 201.28 of the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "guidelines," also known as the "grids"), instead of incorporating the vocational expert's testimony into his determination, and (2) he improperly posed questions to the VE that contained hypothetical heat and respiratory limitations that were more restrictive than the limitations in the ALJ's ultimate RFC determination. (The guidelines are tables that correlate a claimant's age, education, work experience, and residual functional capacity with predetermined findings of disabled or not-disabled.)

At step five in the disability analysis, the burden shifts to the Commissioner to establish that there are jobs that the claimant can perform in the national economy. <u>Young v. Barnhart</u>, 362 F.3d 995, 1000 (7th Cir. 2004). To do this, the ALJ can refer to the guidelines or rely on testimony from a VE. If a claimant's exertional limitations allow her to perform the full range of work at her assigned RFC level, then the ALJ can use the guidelines at step five to arrive at a disability determination. <u>Lee v. Sullivan</u>, 988 F.2d 789, 793 (7th Cir. 1993). By contrast, if a claimant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at her assigned work level, the guidelines may not be used to determine disability at that level. <u>Id.</u>; <u>Nelson v. Secretary of HHS</u>, 770 F.2d 682, 684 (7th Cir. 1985)

19

(an ALJ cannot rely on the guidelines if the claimant's impairments are "severe enough to restrict a full range of gainful employment at the designated level."). Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. Nelson, 770 F.2d at 684 ("where an individual is rendered disabled because of a nonexertional impairment, . . . the grid is inapplicable; a determination of disabled or not disabled is then reached through the testimony of vocational experts who can indicate what work, if any, the claimant is capable of performing.").

In this case, the plaintiff argues that the ALJ committed reversible error by posing a series of hypothetical questions to the VE that included limitations on concentrated exposure to extreme heat and pulmonary irritants, even though the ALJ's ultimate RFC determination did not include those restrictions. After reviewing the evidence, however, the ALJ concluded that the plaintiff could perform a full range of sedentary work, and the heat and respiratory limitations he had posed in his hypothetical to the VE were not warranted. Dkt. No. 10-3 at 33. Consequently, the ALJ was authorized to rely on the guidelines to determine that there are jobs in the national economy that the plaintiff can perform, and did not consider the VE's testimony in response to the ALJ's hypothetical questions. E.g. Stich v. Astrue, No. 09-C-483, 2010 WL 424607, at *14 (E.D. Wis. Jan. 31, 2010) ("because the ALJ found that plaintiff could perform a full range of sedentary, unskilled work, he was permitted to rely on the Grid").

20

The court concludes that the medical evidence in the record does not undermine the ALJ's conclusion that the plaintiff can perform a full range of sedentary work. The ALJ found "no contraindications to unskilled work" and, based on the plaintiff's intelligence and attentiveness, he decided it "would be an insult to her" to suggest that she was limited to "1-2 step tasks" or could not perform unskilled work. Id. at 34. In her brief, the plaintiff criticizes the VE's testimony, but any deficiencies in the VE's testimony have no bearing on the outcome of this case, because the ALJ correctly relied on the guidelines to determine that the plaintiff can perform a full range of sedentary work, and the court finds that conclusion is not in error.

The objective evidence supports the ALJ's decision that the plaintiff could perform sedentary work. The ALJ found that, for the period between October 2010 and June 2011, the plaintiff was able to help her son with homework, prepare meals, volunteer at her church, and run errands. Id. at 33. Her mental status examinations reflected only mild cognitive deficits. There was no evidence her vision was compromised. The plaintiff complained of fatigue during this time period, but she was working at least through October 2010, if not longer. Further, medical consultants for the Disability Determination Services in Wisconsin and California had concluded that the plaintiff was capable of sedentary work. Id. at 20, 33.

The court detects no error in the ALJ's determination that the plaintiff can perform a full range of sedentary work. Because the ALJ correctly found that the plaintiff could perform a full range of sedentary work, the vocational

expert's testimony was not necessary to support his finding that the plaintiff was not disabled, and he did not rely on the vocational expert's testimony. Instead, the ALJ correctly relied on the grids to support his conclusion at step five that the plaintiff was not disabled.

## IV.     CONCLUSION

The court concludes that the ALJ's findings were supported by substantial evidence and his credibility determination was not patently wrong. Accordingly, the court **ORDERS** that that the final administrative decision of Carolyn W. Colvin, Acting Commissioner of Social Security, denying the plaintiff's application for disability benefits is **AFFIRMED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 6th day of March, 2017.

BY THE COURT:

_____

**HON. PAMELA PEPPER**
**United States District Judge**